IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ROBERT KAISER,

                                Plaintiff,                          OPINION AND ORDER

        v.
                                                                    14-cv-762-wmc

UNITED OF OMAHA LIFE INSURANCE
COMPANY, d/b/a MUTUAL OF OMAHA
and GROUP LONG-TERM DISABILITY
POLICY GLTD-AMMA,

                                Defendants.

        In this action arising under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1132(a), plaintiff Robert Kaiser seeks long-term disability

benefits for his deceased wife Dee Kaiser's disability caused by Stage IV lung cancer.

Defendants denied benefits on the basis that Dee Kaiser's disability fell within the pre-

existing condition coverage exception of the long-term disability insurance plan at issue.

Both parties have moved for summary judgment.  (Dkt. ##36, 40.)  For the reasons that

follow, the court will grant plaintiff's motion, finding that defendants acted arbitrarily

and capriciously in invoking the pre-existing condition provision to deny benefits.

Accordingly, the court will remand this case for further administrative proceedings

consistent with this opinion and order.[1]

_____

[1] Also before the court is a motion to strike portions of plaintiff's reply brief on the basis that
plaintiff raised an argument based on a state statute for the first time in reply.  (Dkt. #54.)
Because the state statute, Wis. Stat. § 632.76(2), does not apply to plaintiff's claim, the court
need not consider this argument nor, relatedly, whether ERISA preempts consideration of the
state statute.  Since all of this is immaterial to the outcome of this case, the court will deny the
motion to strike as moot.

UNDISPUTED FACTS[2]

## A.  Overview of the Parties and Claim

Plaintiff Robert Kaiser's spouse, Dee Kaiser, passed away on December 3, 2014, due to progressive brain metastases as a consequence of lung cancer.  (For ease of reference, the court will refer to Robert Kaiser and Dee Kaiser by their first names.) Robert brings this lawsuit under ERISA against defendants to recover long-term disability ("LTD") benefits, as well as enhanced disability and LTD survivor benefits.

Defendant United Omaha Life Insurance Company d/b/a Mutual of Omaha ("Omaha") is the insurer of defendant Group Long-Term Disability Policy GLTD-AMMA ("the Plan").  The policy holder and plan administrator is Dee's former employer Wisconsin Energy Conservation Corporation ("WECC").

Beginning in March 2013, Dee was employed by WECC.  Effective April 1, 2013, she became a beneficiary of the Plan.  The Plan identifies Omaha as the claims administrator under the Plan and grants Omaha has the authority to interpret the Plan in that capacity, as well as decide all questions of eligibility and entitlement to benefits.[3]

## B.  Pertinent Plan Language

The Plan defines "Disability" and "Disabled" to mean:

---

[2] Unless otherwise noted, the court finds the following facts material and undisputed.

[3] Plaintiff points out the inherent conflict of interest in light of Omaha's dual role of insurer and claims administrator.  (Pl.'s PFOFs (dkt. #38) p.4 (second ¶ 19).)  The court addresses this conflict in the opinion below.

that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:

a) during the Elimination Period, You are prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

b) after the Elimination Period, You are:

1. prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

2. unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

(AR 34.)[4]  The "Elimination Period" is defined as the later of 60 calendar days or the date short-term disability ends.  (AR 14.)  The Plan provides for monthly disability benefits in the amount of two-thirds of basic monthly earnings, less other income sources.  (AR 16.)  The Plan also provides for enhanced disability benefits under certain conditions and for survivor benefits.  (AR 23-24.)

Critical to this appeal, the Plan has a pre-existing condition exclusion:  "We will not provide benefits for any Disability caused by, attributable to, or resulting from a Pre-Existing Condition which begins in the first 12 months after You are continuously insured under the Policy."  (AR 25.)  This exclusion includes:

any Injury or Sickness for which You received medical treatment, advice or consultation, care or services, including diagnostic measures, or had drugs or medicines prescribed or

---

[4] The administrative record ("AR") is located at dkt. #35.

3

taken in the 3 months prior to the day You become insured
under the Policy.

(AR 25.)  Since Dee became insured under the Policy as of April 1, 2013, her "pre-existing condition three-month look-back" period was from January 1, 2013, through March 31, 2013.

Finally, "sickness" is defined as:  "a disease, disorder or condition, including pregnancy, that requires treatment by a Physician.  Disability resulting from a sickness must occur while You are insured under the Policy."  (AR 36.)  And the term "injury" is defined as:  "an accidental bodily injury that requires treatment by a Physician.  It must result in loss independently of Sickness and other causes.  Disability resulting from an injury must occur while You are insured under the Policy."  (AR 34.)

### C.  Timing of Dee's Symptoms and Medical Treatment

####     i.     Events During the Look-Back Period

The contemporaneous medical record indicates that Dee injured her shoulder in February 2013 while shoveling snow and scraping ice.  Dee suffered a continuous dull ache from her shoulder to her elbow, which increased with lifting her arm above her head.  On March 12, 2013, Dee saw Dr. Patro for her left shoulder pain.  The treatment notes indicate that Dee "[d]enies any injury or any trauma.  However, she has been doing a lot of snow shoveling over the past 3-4 weeks.  She first noted pain while she was shoveling snow, and it would be when she would do some lifting.  This has gotten progressively worse where she is having trouble doing any lifting, or reaching behind her back, or reaching overhead."  (AR 722.)  After examining Dee's shoulder, Dr. Patro's

4

impression was "[l]eft shoulder pain secondary to rotator cuff and bicipital tendinitis, likely triggered by the repetitious activity." (AR 723.) Patro prescribed Naproxen, an anti-inflammatory pain medication. Dr. Patro also discussed with Dee the possibility of future physical therapy and cortisone injections. (*Id.*)

On March 27, 2013, Dee called Patro's office back and requested a referral to physical therapy. (AR 728) The nurse submitted an order for physical therapy and refilled her Naproxen prescription. (*Id.*) On March 29, Dee attended an initial physical therapy evaluation with Elizabeth M. Roe, PT. Her notes reveal that Dee "presents with a complaint of left shoulder pain." (AR 96.) She also recorded that the physical examination of Dee's shoulder revealed "tenderness over acromioclavicular joint" and "flexion 170 degrees with mid-range pain." (AR 97.) The physical therapist concluded that Dee "has signs and symptoms consistent with rotator cuff impingement, possible degenerative rotator cuff pathology." (*Id.*)

Neither Dr. Patro's or the physical therapist Roe's notes document any concern or suspicion of cancer of metastasis from a primary lung cancer.

### ii. Events After the Look-Back Period

After the look-back period ended on March 31, 2013, Dee continued to be treated for left shoulder impairment and a possible rotator cuff tear with medication and physical therapy. Decreased left shoulder flexion measurement was noted during Dee's April 5, 2013, physical therapy session. Dee was seen again on April 16, 2013, by Dr. Patro and Dawn Mueller, PA-C. At that appointment, Dee continued to complain of left shoulder pain, decreased range of motion and weakness. That same day, Dee had a left shoulder

x-ray that revealed "some mild degenerative changes at the a.c. joint." (AR 105.) Dr. Patro continued to maintain his diagnosis of impingement syndrome of her left shoulder, treating Dee with a cortisone injection and ordering further physical therapy.

Dee attended physical therapy appointments on April 22nd and 29th, but was discharged from therapy on the 29th due to lack of progress. In particular, Dee reported that her pain and range of motion had worsened.

On May 1, 2013, Dee's health insurance changed, and she began treatment with new physicians. On May 3, she was evaluated by John F. Orwin, M.D., an orthopedic surgeon. Dr. Orwin concluded that Kaiser had a possible silent massive tear of her rotator cuff of her left shoulder, and ordered an MRI of her shoulder. On May 7, Dee had an MRI of her left shoulder, which revealed "permeative destructive mass involving the glenoid extending into the coracoid process and scapular body, with a pathologic fracture of the glenoid." (AR 195-97.)

In addition, the radiologists reviewing the MRI results opined that the left shoulder lesions "presumably represent metastatic disease potentially from breast cancer or lung primary." (AR 197.) A May 8th chest x-ray revealed a "cavitary right lung mass." (*Id.*) On May 14, Joseph T. Yang, M.D., diagnosed Dee with metastatic cancer from a primary lung cancer. Subsequent biopsy, CT scans and an MRI all confirmed this diagnosis. On May 29, Dee was diagnosed with Stage IV adenocarcinoma of the lung. She then pursued treatment with oncologist Toby Campbell, M.D.[5]

---

[5] Plaintiff proposes several findings of facts based on Dee's post-May medical treatment, presumably to demonstrate that she was disabled on or after her application date of July 24, 2013. Moreover, plaintiff also submitted evidence of Dee filing for and received social security

**D. LTD Claim**

On June 11, 2013, just less than a month after the cancer diagnosis, Dee's employer WECC emailed an LTD claim form to Omaha on her behalf.  On June 13, WECC faxed a completed LTD Claim Employer's Statement to Omaha also on Dee's behalf.  At that point, Dee was still working intermittently from home.  In July 2013, however, Dee stopped working altogether, applying for LTD benefits on July 24, 2013.

As part of the claims process, Omaha reviewed medical records from Dee's treating physicians.  Because the date of disability was within the first 12 months of the effective policy date, Omaha examined the medical records to determine whether Dee's disability fell within the pre-existing condition exception.  On August 29, 2013, Omaha denied Dee's claim for benefits on the sole basis that Dee was treated for her lung cancer within the look-back period.   (AR 566-69.)  Specifically, Omaha wrote:

> In summary, the obtained medical documentation revealed you were treated for your current diagnosis of lung cancer within the pre-existing look-back period of January 1, 2013, to April 1, 2013.   Therefore, no benefits are payable, and your claim has been denied.

(AR 567.)[6]

---

benefits effective August 2013.  Because these facts are not material to the only issue before the court -- whether Dee had a pre-existing condition that excluded her from coverage -- the court need not recount those facts here.

[6] Plaintiff would make much of the fact that defendants defined the look-back period as January 1, 2013, to April 1, 2013, arguing instead that the letter should have read "to March 31, 2013." As defendants point out, this argument begins and ends with an immaterial, semantics dispute -- whether the look-back period went "up to" April 1, 2013, or went "up to and included" April 1, 2013.  There is, however, no dispute that the last day of the look-back period was March 31, 2013, with coverage effective the next day -- April 1, 2013.  Moreover, there are no events in the record on April 1, 2013, so any error on the part of Omaha in describing the look-back period is meaningless on this record.

On May 13, 2014, Dee filed an administrative appeal from this document, submitting medication documentation. In response, on May 29, Omaha referred Dee's claim to its medical director Thomas A. Redder, M.D., for review. Specifically, Dr. Redder was asked to advise whether Dee's lung cancer was a pre-existing condition.

Among other things, Dr. Reeder consulted with one of Dee's treating oncologists, Dr. Campbell, via telephone in order to understand whether the left shoulder pain Dee experienced in March 2013 was due to her metastatic cancer. (AR 67.) In a letter after that conversation, Dr. Reeder stated:

> I indicated that I was calling to discuss Ms. Kaiser's current medical status and treatment. You advised me that she was now involved in a clinical trial of a drug directed at her specific epithelial growth factor receptor mutation. I had questions about the onset of her left shoulder pain in February 2013 that was originally attributed to shoveling snow. It appeared to me that this *in retrospect* was from metastatic disease. You responded that it absolutely was and that she had a very large metastasis.

(*Id.* (emphasis added).) Dr. Reeder than asked Dr. Campbell to sign the bottom of the letter if Dr. Reeder "captured the substance of" their conversation. (*Id.*) Dr. Reeder also instructed Dr. Campbell to make any changes, additions or deletions if he so wished. (*Id.*)

Dr. Campbell signed and dated the letter on June 11, 2014, without edits. On June 19, Omaha upheld its initial denial of Dee's LTD benefits on the basis that her lung cancer was a pre-existing condition. On May 27, 2015, Omaha also denied Robert's claim of LTD survivor benefits relying on its earlier denial of Dee's LTD benefits.

OPINION

## I.  Standard of Review

This court reviews an administrator's decision to deny eligibility for ERISA insurance plan benefits under the arbitrary and capricious standard.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).  While highly deferential, the Seventh Circuit cautioned in *Holmstrom* that this standard of review does not make the court a "rubber stamp." *Holmstrom*, 615 F.3d at 766.  More specifically, the Seventh Circuit acknowledged in the past that the decision must be "downright unreasonable" before reversal by a federal court would be appropriate, but clarified that statement in *Holmstrom*, explaining that the standard of review:

> should not be understood as requiring a plaintiff to show that only a person who had lost complete touch with reality would have denied benefits.  Rather, the phrase is merely a shorthand expression for a vast body of law applying the arbitrary-and-capricious standard in ways that include focus on procedural regularity, substantive merit, and faithful execution of fiduciary goals.

615 F.3d at 766 n.5.  In this way, the Seventh Circuit suggested that "[f]or ERISA purposes, the arbitrary and capricious standard is synonymous with abuse of discretion." *Id.* at 767 n.7 (internal citation, quotation marks and alterations omitted).

Plaintiff also points out that his claim should be viewed in light of Omaha's dual role in administering WECC's Plan, given the inherent conflict between having "both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due."  *See Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d

9

856, 861 (7th Cir. 2009) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). Plaintiff justifiably points out in particular that the conflict here is inherent not just with respect to one company, Omaha, but one individual, Dr. Rudder, in that he acted as both consulting physician and as Omaha's medical director.   While this "conflict of interest" does not alter the basic standard of review -- an abuse of discretion standard still applies -- it is properly "weighed as a factor in determining whether there is an abuse of discretion." *Glenn*, 554 U.S. at 115 (citing *Firestone*, 489 U.S. at 115) (quotation marks omitted); *see also Holmstrom*, 615 F.3d at 766 (describing this factor as a "key consideration").

Ultimately, ERISA requires that "the administrator . . . weigh the evidence for and against [the denial of benefits], and within reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review."   *Halpin v. W.W. Grainger*, 962 F.2d 685, 695 (7th Cir. 1992) (internal citation and quotation marks omitted).   The court will, therefore, uphold an administrator's decision "if (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem."   *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 686 (7th Cir. 2004) (internal quotation marks and citations omitted).

## II. Review of Denial Decision

The parties agree that Omaha's denials of Dee's and Robert's claims for benefits based on the pre-existing condition policy exclusion turn on an assessment of the medical events falling within the "look-back period" from January 31, 2013, to March 31, 2013. During this period, the record reveals three events:  (1) Dee's March 12th appointment with Dr. Patro for shoulder pain, described as "left shoulder pain secondary to rotator cuff and bicipital tendinitis, likely triggered by the repetitious activity," for which she was prescribed Naproxen, an anti-inflammatory pain medication, and possible future physical therapy and cortisone injections (AR 723); (2) Dee's March 27th call with Dr. Patro's nurse, which resulted in a referral to physical therapy and a refill on Dee's Naproxen prescription (AR 729); and (3) Dee's March 29th physical therapy evaluation by Elizabeth M. Roe, PT, in which Roe noted "signs and symptoms consistent with rotator cuff impingement, possible degenerative rotator cuff pathology" (AR 97).

As quoted above, each of the events falling between January 1 and March 31, 2013, could constitute a "pre-existing condition" under the policy if it concerned an "Injury" or "Sickness" (here, Dee's lung cancer) "for which [she] received medical treatment, advice or consultation, care or services, including diagnostic measures, or had drugs or medicines prescribed or taken."  (AR 25.)  There is no doubt that the "Sickness" here is lung cancer.  The question, therefore, is whether a doctor's visit for shoulder pain, prescription of pain medication, subsequent referral to physical therapy, and one physical therapy session were "*for*" Dee's cancer.

11

To help answer this question, the parties direct the court to two Seventh Circuit cases.  Defendants primarily rely on *Bullwinkel v. New England Mutual Life Insurance Company*, 18 F.3d 429 (7th Cir. 1994), which affirmed a district court's grant of summary judgment in favor of the insurer, finding that the plaintiff's claim fell within the pre-existing condition exception to coverage.  In that case, the plaintiff noticed a lump in her left breast in July 1991.  *Id.* at 430.   On July 21, she visited her doctor, who performed an ultrasound examination.  The doctor diagnosed the lump as a cyst, but "made no definite conclusion whether the cyst was cancerous or benign," referring the patient to a surgeon for removal and biopsy of the cyst," out of concern "about the possibility of cancer."  *Id.*  The plaintiff's insurance policy went into effect just ten days later, on July 31, 1991, which also marked the end of the policy's look-back period.  *Id.* at 429.  Although the plaintiff was not actually diagnosed with cancer until September, the insurance company denied coverage for surgery and subsequent treatments on the basis that her cancer was a pre-existing condition.  *Id.* at 430.

In *Bullwinkel*, the plaintiff argued that because her cancer was not diagnosed during the look-back period, she could not have been "seen, treated, [or] diagnosed" for cancer within that period.  *Id.* at 431.  Affirming the district court's rejection of this argument, the Seventh Circuit held that:

> even though Madelaine [the plaintiff] did not know the lump was cancerous, her visit with the doctor in that month concerning the lump actually concerned cancer.  It follows that Madelaine was 'seen' and 'treated' and incurred medical expenses for her cancer in July.

*Id.* at 432.   In so holding, however, the Seventh Circuit specifically contrasted Madelaine's situation to someone who experienced symptoms during the look-back period that were "trivial and inconclusive like a cough or rash which might imply any of a variety of maladies, or none at all." *Id.* at 432.

In addition to emphasizing this contrasting example in *Bullwinkel*, plaintiff principally relies on the Seventh Circuit's decision issued two years later in *Pitcher v. Principal Mutual Life Insurance Company*, 93 F.3d 407 (7th Cir. 1996).  In *Pitcher*, the court concluded that a plaintiff's receipt of a physical breast examination and mammogram during the look-back period did not constitute treatment for breast cancer, and therefore coverage was not precluded by the policy's pre-existing condition provision, even though plaintiff's doctor had already discovered lumps in both breasts during a prior routine examination.   *Id.* at 409.   The court discounted this earlier discovery in particular, because plaintiff's treating physician did not consider the lumps "unusual or alarming" in light of the plaintiff's "longstanding fibrocystic breast condition." *Id.*

Pitcher's similarities with the facts here do not end with what was probably in retrospect a misdiagnosis.   Indeed, Pitcher returned six-weeks later for a follow-up appointment, just two days before her health insurance policy became effective.  That appointment revealed that the lumps had not subsided, and the plaintiff was referred to a radiologist for a mammogram of both breasts that same day, which revealed "a suspicious mass in the left breast which warranted follow-up investigation." *Id.*  Two days later, the plaintiff's policy went into effect, marking the end of the look-back period.  The next day, a biopsy revealed a carcinoma or malignant tumor.

13

In affirming entry of summary judgment in favor of the plaintiff-insured, the Seventh Circuit stressed that "Pitcher did *not* receive a 'treatment or service' *for* breast cancer [before the policy took effect] because -- as the district court found -- she was being monitored for the longstanding fibrocystic breast condition and not cancer during the pre-coverage period." *Id.* at 412 (emphasis in original). In so holding, the court relied on the fact that "[n]either the plaintiff nor her physician, *at this juncture*, had reason to suspect that Pitcher's symptoms were anything but a continuation of her longstanding fibrocystic breast condition." *Id.* (emphasis added). In turn, the court also rejected the insurance company's "attempt to characterize the lumps felt by Dr. Manifold in July and late September as symptoms of the as-yet undiagnosed breast tumor," because "the record does not support this speculative characterization." *Id.* The court reiterated later in its opinion that the critical fact is whether the physician rendering services during the look-back period "suspects" the condition (in *Pitcher* and here, cancer) for which the insured is seeking coverage. *Id.* at 413; *see also id.* at 414 (discussing the "unfairness of defining a condition as 'pre-existing' when the person suffering from the condition (i.e., the plaintiff) 'does not know, or have reason to know of the existence of the condition'" (quoting *Hardester v. Lincoln Nat'l Life Ins. Co.*, 841 F. Supp. 714, 716 (D. Md. 1994)).

Reading *Bullwinkel* and *Pitcher* together, a test arguably emerges for reviewing denials based on a pre-existing condition exclusion: "although a plaintiff need not be definitely diagnosed with a condition during the [look-back] period[,] there at least must have been some concern or suspicion at that time that the observed symptoms were

caused by the particular condition in order for the patient to be considered as being treated or seen *for* the particular condition." *Goerig v. Phoenix Home Life Mut. Ins. Co.*, No. 97 C 1890, 1998 WL 801793, at *7 (N.D. Ill. Nov. 13, 1998).  Indeed, this test has been embraced by other circuits presented with the same issue as here.  *See, e.g., LoCoco v. Med. Savings Ins.*, 530 F.3d 442, (6th Cir. 2008) ("[C]ourts have concluded that the ultimate condition need only have been suspected with a reasonable degree of likelihood in order to be considered 'pre-existing.'"); *Lawson v. Fortis Ins. Co.*, 301 F.3d 159,  (3d Cir. 2002) (rejecting pre-existing condition denial because "it does not make sense to say that [the plaintiff] received treatment 'for' leukemia when the actual condition was not suspected"); *Hughes v. Boston Mut. Life Ins. Co.*, 26 F.3d 264, 269 (1st Cir. 1994) (requiring "some awareness on the part of the physician or the insured that the insured is receiving treatment for the condition itself" in order to qualify as treatment "for" a condition).

The Third Circuit persuasively described the distinction between cases in which the pre-existing condition coverage exclusion applies and those in which it does not:

> When a patient seeks advice for a sickness with a specific concern in mind (e.g., a thyroid lump, as in *McWilliams* [*v. Capital Telecomms. Inc.*, 986 F. Supp. 920 (M.D.Pa.1997)], or a breast lump, as in *Bullwinkel*[, 18 F.3d 429]) or when a physician recommends treatment with a specific concern in mind (e.g., a "likely" case of multiple sclerosis, as in *Cury* [*v. Colonial Life Ins. Co. of Am.*, 737 F. Supp. 847, 854 (E.D. Pa. 1990)]), it can be argued that an intent to seek or provide treatment or advice "for" a particular disease has been manifested. But when the patient exhibits only non-specific symptoms and neither the patient nor the physician has a particular concern in mind, or when the patient turns out not to have a suspected disease, it is awkward at best to suggest that the patient sought or received treatment for the disease

15

> because there is no connection between the treatment or
> advice received and the sickness.

*Id.* at 166.  Stated another way, "a suspected condition without a confirmatory diagnosis is different from a misdiagnosis or an unsuspected condition manifesting non-specific symptoms." *Lawson*, 301 F.3d at 166.

Another case involving lung cancer offers a stark factual contrast to the circumstances at issue here.  In *LoCoco*, 530 F.3d 442, the plaintiff experienced pain in his chest and a dry cough during the look-back period.  *Id.* at 443-44.  Due to the plaintiff's cigarette habit and chest pains, his treating physician ordered a chest x-ray, in part, because he believed he could be a "candidate for lung cancer 'at any time.'"  *Id.* at 444.  A later x-ray revealed a "cloud" in his left lung, and a CAT scan was ordered because "an obstructive endobronchial lesion [could not] be ruled out."  *Id.*  While the CAT scan did not reveal cancer, another test was ordered and plaintiff was referred to a pulmonologist.  *Id.*

All of these medical events occurred pre-coverage, during the look-back period. Unsurprisingly, from this record, the Sixth Circuit affirmed the district court's grant in favor of the insurance plan, finding that the illness for which the plaintiff was treated during the pre-existing period "was suspected *at the time* to be, and was in fact, lung cancer."  *Id.* at 446 (emphasis added).

Unlike *LoCoco*, there is *nothing* in this record to support a finding that Dee's medical treatment providers -- her primary doctor at that time, that doctor's nurse, or the physical therapist -- suspected that Dee's shoulder pain was due to cancer.  Their contemporaneous notes show that a cancer diagnosis was not even on the radar screen.

16

Instead, Dee received medical treatment and was prescribed medication for shoulder pain.   During the entire three month period pre-dating her coverage, neither her physicians nor Dee had any reason to suspect that her symptom of shoulder pain was due to cancer.   To the contrary, everyone suspected during this period that Dee's pain and loss of strength in her arm was due to overuse in shoveling snow or impingement / deterioration of her rotator cuff.

The fact that Dee was eventually diagnosed with cancer and that her shoulder pain "*in retrospect*" was caused by her cancer is not material to a determination of whether her medical care providers at the time of the medical treatment suspected cancer.  (AR 67 (emphasis added).)  "To permit such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless:  any prior symptoms not inconsistent with the ultimate diagnosis would provide a basis for denial."  *Lawson*, 301 F.3d at 166 (internal citation and quotation marks omitted).

In its opposition to plaintiff's motion for summary judgment, defendants attempt to distinguish *Pitcher* and other cases on the basis that those courts reviewed the denials *de novo*.  (Defs.' Opp'n (dkt. #46) 9, 14.)  While the standard of review in some cases is outcome determinative, it is not here.   Defendants acted arbitrarily and capriciously in interpreting and applying the Plan's preexisting provision unreasonably and contrary to Seventh Circuit law.  "In some cases, the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious."  *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 461 (7th

Cir. 2001); *see also Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 540 & n. 9 (7th Cir. 1996) ("[I]f administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious."). Here, to the extent this were a closer question, the dual role conflict of interest would act as a tie breaker. *See Glenn*, 554 U.S. at 115.[7]

As such, the court holds that defendants' denial of plaintiff's claim based on the pre-existing condition exception was arbitrary and capricious. While there seems to be no question that Dee was disabled as defined by the Plan, the court will nonetheless remand the case for further administrative proceedings. On remand, however, defendants may not rely on their erroneous and unreasonable interpretation of the pre-existing condition coverage exclusion in determining coverage.

### III.  Fee Award

This court may in its discretion award a reasonable attorney's fee and costs to either party in an ERISA action brought under § 1132:

> In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

29 U.S.C. § 1132(g)(1).

In *Hardt v. Reliance Standard Life Insurance Company*, 560 U.S. 242 (2010), the Supreme Court provided guidance as to the threshold a party must reach to be eligible

---

[7] Particularly troubling is Dr. Reeder's drafting an arguably self-serving letter to Dee's doctor, seeking his sign off to a characterization of the medical record that only Reeder knows will empower him to deny coverage under this interpretation of the Plan.

for a discretionary award under this fee-shifting provision. The Court found that the party need not be the "prevailing party," as, for example, would a plaintiff in civil rights cases under 42 U.S.C. § 1988. Rather, the party must simply show "some degree of success on the merits before a court may award attorney's fees under § 1132(g)(1)." *Id.* at 255.

> A claimant does not satisfy that requirement by achieving trivial success on the merits or a purely procedural victory, but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was substantial or occurred on a central issue.

*Id.* (internal quotation marks and alterations omitted).[8]

Once a party has achieved "some success on the merits," the court decides whether awarding fees is appropriate applying two tests: the "substantial justification" test and the five-factor test. *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1089 (7th Cir. 2012). "The two tests essentially pose the same question: was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Id.* at 1090. More recently, the Seventh Circuit arguably left open the possibility of a district court considering only whether a party achieved some degree of success on the merits, while still encouraging and giving deference to rulings that also apply a more stringent test. *Temme v. Bemis Co., Inc.*, 762 F.3d 544, 550 (7th Cir. 2014).

---

[8] In so holding, the Supreme Court noted specifically that use of a "five factor" test referred to in some Seventh Circuit decisions and in decisions from other circuits is "not required for channeling a court's discretion when awarding fees under this section." *Hardt*, 560 U.S. at 255.

Having found that defendants violated ERISA by acting arbitrarily and capriciously in denying Dee Kaiser's benefits, and ordering remand to the Plan Administrator for further review, plaintiff achieved all he could achieve in this court.[9] The court also finds plaintiff entitled to recover fees under the substantially justified and five factors tests.   In determining whether a defendant in an ERISA action was substantially justified, the court is to consider "a party's posture during the case as a whole," including "*pre*litigation behavior."   *Temme*, 762 F.3d at 551 (emphasis in original).   Here, defendants' interpretation of the pre-existing condition clause was at odds with fairly settled Seventh Circuit case law, particularly after *Pitcher*, rendering defendants' posture during the case as a whole not substantially justified.

The five factors that courts are to consider in determining whether to award fees under ERISA § 502(g)(1) are:

> 1) the degree of the offending parties' culpability or bad faith; 2) the degree of the ability of the offending parties to satisfy personally an award of attorney's fees; 3) whether or not an award of attorney's fees against the offending parties would deter other persons acting under similar circumstances; 4) the amount of benefit conferred on members of the pension plan as a whole; and 5) the relative merits of the parties' positions.

*Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 506 (7th Cir. 2011).   Here, the court's finding that defendants' position was not substantially justified bears directly on a similar finding that defendants were substantially culpable and acted with little merit in denying plaintiff's benefits (the first

---

[9] As this court explained at length in an opinion in another ERISA denial-of-benefits case, the fact that the relief provided is remand and not an award of benefits does not foreclose an award of fees. *Rappa v. Sun Life Assur. Co. of Canada*, No. 10-CV-585-WMC, 2014 WL 4415242, at *2 (W.D. Wis. Sept. 8, 2014).

and fifth factors).  Further, the second and third factors -- defendants' ability to pay and the fact that such an award may deter defendants and other plan administrators from denying benefits arbitrarily and capriciously -- weigh in favor of an attorney's fee award. While the fourth factor is not relevant given that this case involves a single beneficiary, rather than a broader group of plan participants, neither does it militate against an award of fees called for by the other four factors.

By any test then, the court finds an award of attorney's fees and costs appropriate under 29 U.S.C. § 1132(g)(1).  Accordingly, as set forth below, the court will direct plaintiff to submit its fee request and will provide defendants an opportunity to respond to that request.

ORDER

IT IS ORDERED that:

1) Plaintiff Robert Kaiser's motion for summary judgment (dkt. #36) is GRANTED.

2) Defendants United Omaha Life Insurance Company d/b/a Mutual of Omaha and Group Long-Term Disability Policy GLTD-AMMA's motion for summary judgment (dkt. #40) is DENIED.

3) Defendants' motion to strike portions of plaintiff's reply brief (dkt. #54) is DENIED as moot.

4) On or before February 12, 2016, plaintiff submit its brief and any supporting materials in support of its request for attorneys' fees, including itemized time records, invoices, and proof of payment of such invoices.  Defendants may have until February 26, 2016, to file a response.  If defendant challenges the reasonableness of plaintiff's fee request in that opposition, its counsel shall also contemporaneously submit its itemized time records, invoices and proof of payment of such invoices.  Plaintiff's reply, if any, is due by March 4, 2016.

Entered this 29th day of January, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

22